13-5073. So we're going to hear from Mr. Leith, who's going to take eight minutes and then yield to Mr. Wall. Is that correct? That's correct. I'm Richard Leith, representing Sensory Exploration in this manner. Obviously a very complex and many issues here. And very confusing. I found your brief very confusing. I'm trying to sort out what's going on here, because you seem to be complaining about all sorts of things in the brief that really are kind of irrelevant here. So what I'm trying to figure out is exactly what the problems are that you're complaining about. One, as I understand it, is changing the 30-day period to 120 days. That's correct. And then the other one that I understand is requiring a blowout protection scenario, which under the earlier version wasn't required for the NTL. Am I correct in identifying those two as being the problems here, or am I missing something? A little bit. Obviously more than that, there's an NTL that changes all kinds of drilling rules, etc., and whether that's reasonable. But zeroing in on those are the most important ones, and let me see if I can be clear on that. What we're complaining of is that when we entered this contract, obviously the contract says, and as the court has found, the lower court found, and Amber, etc., the risk of change in Oxley is on us, the risk of other changes is on the government. What we're saying is that the government, when we entered this contract, the worst-case discharge analysis that had to be done by everybody in the offshore drilling, had a lease for offshore drilling, had to do a worst-case analysis, worst-case discharge analysis that was required under the OPA, Oil Pollution Act. Take the second point first. Let me see if I can understand. If I understand correctly, the Oxley regulation did require a blowout scenario, and that the NTL from OA waived that requirement in your circumstances, and then the NTL-06 reimposed that requirement. Well, that's not really the complaint. The blowout scenario does come from, as I understand, the OPA, the Oil Pollution Act, and what was allowed was the government under Oxley could ask for the information on your blowout analysis. That was waived originally and put back in. That really isn't a major issue here. Okay, the issue is the calculation of worst-case discharge. The Oil Pollution Act requires an offshore operator leaseholder to calculate what the potential worst-case discharge is. They had a formula, and we had this lease, we entered this lease, under the OPA rules, we did that calculation. What's the change in the formula? I'm going to explain what changed. The Oil Pollution Act requires us to do this. We did it. We calculated 1,500 barrels a day. We submitted our oil field response plan, which is required under OPA, with that worst-case discharge. We then filed for an expiration plan, and the government approved that, approved the worst-case discharge under OPA of 1,500 barrels. Then you have BP, and they say, wait, recalculated new rules. They changed the rules in these particular respects. Where? Okay, well, in the NTL, it says now, in the NTL-010-06, they made changes. That is now incorporated into... Show us the page. Okay, well, I'll show you where it exists now. I'm particularly referring to NTL-212-06, which is the reincarnation of NTL-010-06. And in that one, which is in the Joint Appendix at 13-17, on page 29, it tells you at the top of the page... 13-17. Yes, and then if you go to the Joint Appendix, page 14-06, which is page 29 of that NTL, it tells you now what we've changed is, you consider the wellbore as having nothing in it. It's totally open. What page are we talking about? 29. 13-29? No, the Joint Appendix would be 14-06. 14-06. Page 29 of the NTL. This NTL, when they originally did NTL-010-06 and incorporated these changes... Well, we're specifically on this page. Okay, well, all through this NTL, but without going into detail in that regard, at the top of the page, if you look at... I'm reading double I. If the worst-case discharge scenario in an oil discharge during exploratory or development drilling operations, calculate the initial volume of worst-case discharge in accordance with the requirement of 254-47B. That is an Oil Field Pollution Act regulation. And this next paragraph changed the rules. The next paragraph says, now, where we used to say, do this calculation this way, now we say, don't worry about anything... What are the differences in the calculation? That's what I'm telling you. The difference in the calculation is you no longer consider anything being in the well bore, in other words, the drilling bits, etc. And as an obstruction, just assume it's all wide open and consider all reservoirs, not just where you're drilling to, but anything you might pass through as coming through the hole. Okay, so why isn't that a change in the oak flood? Because that wasn't required. That rule, look at the top. It says this is the requirements of 254-47B. That is an OPA, Oil Field Pollution Act regulation. This is a change. Worst-case discharge comes from OPA, not OCSLA. The only thing OCSLA did was say you can ask for the information. How you do it is... Well, why didn't they supplement this? I mean, there was no actual change to the OPA regulation, right? Well, okay, this is where we get into... Well, is that yes or no? Was there a change to the OPA regulation? The regulation itself... 254-47B. That's one of the things we're complaining about. This is done by NTL. They changed the rule. They changed how they apply it. They effectively made a substantive change to the rule trying to do it with an NTL. And we're saying, well, first of all, that should have gone through CUMMIT. With an OCSLA NTL. Excuse me. With an OCSLA NTL. Read the one. The one I'm telling you. The one that starts at 1317 says it's OPA. It's all based on OPA. It says in its very contents, in accordance with the Oil Pollution Act, the implementation of this. All of this is OPA. This entire regulation, NTL-212-06, which is the reincarnation of 10-06, it's in effect now, is entirely based on OPA. Where does it say that? It says right at the beginning, in accordance with the Oil Pollution Act, as implemented by Phase 1, the Joint Appendix 13-17. 13-70? 17. 13-17. Here's one of the difficulties of splitting an argument when basically one case is revealed here. We'll give you four minutes. Could I just ask him to show me where it says it's based on OPA? Okay. If you look on that page, Page 13-17, it says background. Right in there it says, in accordance with the Oil Pollution Act. It's the middle of the page. 13-17. 13-17, the middle of the page, background. First sentence. Okay, I'm showing you what I have is 13-17, and it doesn't look like what you're holding up. I have the same problem. Is there a problem with the Joint Appendix? J-13-71. Oh, I had the numbers. Sorry, I transposed the numbers. 13-71. 13-71. But I don't see where it says that everything in this NTL is based on the Oil Pollution Act. Okay, let's look. It says, in accordance with the Act, what they're doing is implemented by that. 30 CFR Part 254, and then Part 254 is an OPA regulation. Everything in there, if you look through this entire NTL, everything is based on 254. All of that is OPA. And what I was talking about particularly is on Page 14-06, where it says that the worst-case discharge is based on the requirements of 254.47B. It's an OPA regulation. Thank you, Mr. Leaf. We'll give you four minutes. We'll be right back. In the meantime, let's hear from Mr. Wall. Take three minutes. May it please the Court, Guy Wall here on behalf of Champion. The argument is that the changes to the worst-case discharge, which is a concept that you only find under the Oil Pollution Act. You can start with the statute and follow it right through the regulations. It was a long-standing interpretation. That's undisputed. The government offered no evidence. There was no change to OPA or the OPA regulations, correct? The FAQ changed the interpretation of the regulations. Is there any change to the OPA, the statute, or the OPA regulations? There is no change in the literal language. Nor was there in Appalachian hunters, I mean, excuse me, Alaskan professional hunters, there was no change. There was no change when this Court said that the reinterpretation of the CZMA, okay, constituted a new regulation. How do I know that these, what you claim are the imposition of new requirements, is based on OPA when there was no change in the OPA regulations as opposed to supplementation of the OPA regulations as part of an OPSLA directive, which is what we have here in front of us. Okay. Worst-case discharge. That's only found in OPA. FAQ attached to NTL 6, 2010 NTL 6, changes how you calculate worst-case discharge. It makes the change. And I can tell you exactly what it does. Okay, but assuming that it makes the change, why isn't it a change in accordance with OPSLA rather than a change to OPA? Because OPSLA has no worst-case discharge. The whole response plan, everybody has to prepare a response plan. That's the problem. We can't afford this billion-eight, one billion-eight response plan. Everybody has to have a response plan, and you have to certify you're capable of performing it, obviously. Well, they changed how you define worst-case discharge, which is only defined in 247, I mean, excuse me, 254.47. It's the only place you find the definition. That changed by this FAQ. By the explicit terms, they said they're changing worst-case discharge. So they changed how you have to respond to the spill. The response plan is required under the Oil Pollution Act, not OPSLA. Okay? That changed. Well, I'm not sure that's true, because as I read the OPSLA regulation, they do require a worst-case discharge scenario, and at least for part of that, they refer over to OPA. That's right. And that's where the definition is contained. That's what has to be the definition. So it's not true that OPSLA is not concerned with worst-case discharge scenario. They say they are, but they chose to adopt the OPA standards. Correct. Okay, so now they've gone beyond the OPA standards in this NTL, according to you, and what I'm saying is why should we construe that as being a change to OPA as opposed to an OPSLA supplementation to what OPA previously required? Well, however you change the definition, okay, you are talking about a definition that was done under OPA. Now, OPSLA and the Interior has the authority to change. They have the authority to issue regulations implementing the Oil Pollution Act as applicable to the Outer Continental Shelf. Mr. Worrell, there's no need to shout at the court. I'm sorry. I beg your pardon, Your Honor. Please accept my apology. The Department of Interior— You're blowing up my hearing aids, Counsel. Okay, I'm frequently accused of getting excited, and I apologize for that. Congress granted the authority of the President who delegated to Interior the ability to issue regulations under the Oil Pollution Act. That's the only act that requires a response plan, an oil pollution response plan. Well, I don't think that that's necessarily true. Some of the prior cases under OPSLA, which neither side cites in its brief, deal with the authority of Interior under OPSLA, and it seemed to me to give pretty broad authority to them. Well, they may have broad authority, but there's nothing that authorizes— The oil spill response plan is in the statutes. It's in the Oil Pollution Act of 1990. It says you do an oil pollution— The regulations say that this is being adopted under the Oil Pollution Act of 1990. Maybe it says that. Maybe it doesn't. But, I mean, under OPSLA, wouldn't the Secretary of the Interior independently have the authority to require a response plan? That's an interesting question. There was nothing explicitly delegated to Interior and OPSLA to do that. Now, you might be able to read between the lines. You know, I haven't done that analysis. There might be some loose language in there, maybe for conservation. Well, talk about preventing waste and conservation. Why isn't a response plan pursuant to that authority? Well, first of all, no case ever says that, number one. Well, I don't know. The trouble is, these cases, you guys haven't discussed in your brief, nor has the government in the cases, you have a pretty broad scope of authority under that language. That may be, but they haven't exercised that authority. Well, that's the question, as to whether they exercise that authority or not. Okay, let's talk about the FAQ, and I'm sorry I'm going over time, but if you take a look at the FAQ that we're discussing right now, it says— Where are you? I'm talking about in— Page. Page. What page? You know where that is in the record. It's in our brief on page 9. I get it. When you come here to argue, you need to know the record, you know, so you can show it. Yeah. You know, we trust you, but not entirely. You need to see what you're referring to. Okay. I'll get to that in just a second. But if you look at FAQ question— Oh, I know where it is. According to my brief, it's cited at page JA663. 6— 663. 663. Yes. That should be the FAQ. Is that it? Okay. Now, if you go down to question 15— Okay. If you go down to question 15, it says, 30 CFR 254.47B states— Okay. That citation right there is to the only regulatory definition that there is for worst-case discharge. Which wasn't changed. Well, that's what we submit was changed, Judge. Yes, it was not done by changing the language of the regulation, but it was certainly changed by what follows. For instance, for years beforehand, you counted the fact that you had a blowout preventer on the well when you determined worst-case discharge. You only had to have reservoirs that were thicker than 15 feet, and you assumed that what was in the well bore was what was in fact in the well bore. All that changed. It resulted in a monumental increase. But where's the change? Okay, look at paragraph 16, please. Okay. If you see there, it says, resistivity or induction log showing a minimum of 15 feet to be producible. Before that, if it was less than that, you wouldn't count it. That's no longer the case according to this. That's one of the reasons. It's actually quite technical, but the lower court found as a fact that it had changed the result of the calculation. Secondly, if you look at 18, it says, assume the well bore is free of drill pipe, logging tools, or equipment. That's question 18. All right? Mm-hmm. And then finally, if you would please, look at question 19. It says, assume that the BOP, BOP means blowout preventer, says assume that the blowout preventer is not connected to the wellhead. Okay, how do we know these are changes? Because they have never been required. Well, it's in the record as evidence that this was not there before. What is in the record? The fact that this changed, as the lower court found, that this changed the computation. Does the government admit that this has changed? Well, they call it evolution. I consider that admission, but I leave it to you. I think they do admit it. They say it's evolved. Okay? It's undisputed that this changed the calculation, as the lower court found. It's undisputed. Should I stop now? Yes, I think we've given you quite a bit of extra time, Mr. Long. You did, and I apologize for taking so much time. And we'll hear from the government, please. Thank you. Thank you. Good morning, may it please the court. This case is not difficult in our view. It concerns... Really? Yes, Your Honor. It concerns the aftermath, of course, of the Deepwater Horizon disaster and a number of regulatory actions taken by the Department of... changes in the regulatory requirements. There were no changes in the regulations. No, I know that. But, you know, you can change something without changing the regulation by imposing a supplemental requirement that's not in the regulation or changing the interpretation of the regulation or whatever. For example, let's take the simplest one, where the earlier regulation seemed to say a 30-day scenario, and then there's apparently an email or something like that that changes it to 120 days. That's a change, right? It is a change for purposes of submitting an exploration plan or development and production plan. And the authority to make those type of changes are, or I should say were, in existing regulations that were in existence at the time the lease was issued. Well, the question is if they were changes that were made pursuant to OPA, you've got a problem. If they were changes pursuant to OCSLA, then under the lease, it's okay. And that's what they're contending that the changes that were made, and you seem to agree that there were some changes, at least from 30 to 120 days, they say, no, no, that was a change pursuant to OPA, not a change pursuant to OCSLA. OPA, Your Honor, applies to a number of different activities offshore. If you change an OPA regulation, you've got a problem under the lease, right? Because only old, existing OPA regulations at the time of the lease are incorporated. Correct? We don't necessarily agree, Your Honor. There is substantial overlap between OCSLA and OPA. Just take OPA itself. If you change an OPA regulation, you are not protected by the language of the lease, right? Because it only incorporates existing OPA regulations. Not incorporated by Section 1. That's correct, Your Honor. All right. So you have to show us that the change that was brought about here was brought about pursuant to OCSLA, because under the lease, the lease incorporates future regulatory action under OCSLA. So they say, no, no, this isn't an OCSLA change. It's an OPA change. How do I know that they're wrong? You know, Your Honor, because exploration plans and development and production plans are pure OCSLA documents. They don't exist under the Oil Pollution Act, which applies to a number, any number of oil activities, oil and gas activities offshore. What these changes did, for example, the new assumptions, assume now that your oil blowout is going to, instead of being 30 days, it's going to be 120. That's for purposes of plans, the plans being exploration plans and development and production plans. That is, in that context of these plans, pure OCSLA entities and things that these changes were made, these changed assumptions. Well, you say that, but show me where it says that. Yes, Your Honor. If we turn, for example, within NTL-06, we're at Joint Appendix page 657 and 658. Actually, I'll go up through 660. That's the end of NTL-06. All of the regulations that are cited in the NTL are regulations that relate to plans, exploration plans and development and production plans. So, for example, in the first paragraph, the purpose, that's pursuant to 30 CFR 250.213, that's the exploration plan reg, one of them, that tells what an operator has to put in its exploration plan and that it submits to Interior for approval. There's another reg, for example, 30 CFR 250. For example, look at page 657. It says, pursuant to 30 CFR 250.219, 250.250. All OCSLA regs, Your Honor. All OCSLA regs. I thought those were OPA regs. They are not, Your Honor. There's not a single OPA reg cited in this NTL, not one. Where they are cited, and I'm trying to be fair, where they are cited is in the FAQ document that counsel referred to during his argument that talks about where in OPA regulations that term is used. And in OPA regulations, it is definitely there. But when Interior latches onto that and brings it over for purposes of the exploration plan or the development and production plan, Interior is doing that under OCSLA. Interior could be reaching out to the tax code and saying, we want you to certify under the tax code that this is happening as part of your exploration plan. It could reach out under any number of statutes. But when it does so for purposes of these plans that I'm talking about, these are actions that the Secretary has plenary authority under OCSLA to take. But the problem I'm having is that the OCSLA regulations seem to cross-reference the OPA regulations, correct? I mean, for example, if you look at 550.219, it says an oil spill response plan refers you over to the OPA regulations, right? It does. Right. So how do I know that when the oil field response plan is changed that that change is being made pursuant to OCSLA as opposed to OPA? Because the change is being made in the context of an exploration plan or a development and production plan only. That's it. There may be other reasons in OPA as to why you have to have an oil spill response plan. But what the Secretary did, what Interior did, and the actions that are challenged by plaintiffs was in the context of these plans that are pure OCSLA. I don't know if that... Is it fair to say that in other contexts? Give me an example. A vessel. A vessel that transports oil. Okay. Yeah. So, again, this is what we're looking at. Now, I do want to respond to the FAQ points that counsel made. And by the way... So what you're saying, if I understand it correctly, is that the OPA regulations don't specifically apply to these exploration plans. Correct? What's that, Your Honor? The OPA regulations don't directly apply to the exploration plans that have to be submitted under the lease. Well, I don't think that's accurate, Your Honor. They do apply. They do apply. Because the Secretary of Interior says they do apply to... No, but... The OPA regulations themselves, taken by themselves, do not apply to these exploration plans. They apply... Yes, they do, Your Honor, along with many other activities. I do believe... Under OPA itself. OPA does mention plans. Okay. But none of those... Again, none of the OPA regulations changed. Well, but the interpretation of them may have changed. The assumptions going into some of the calculations. How did 30 days get changed to 120 days? What happened to change that? Well, that was informal guidance from... Well, it's a change. You said you used to have to do 30 days, which is what the OPA regulations say. Now you've got to do 120 days. The question, Your Honor, is what authority or what statute did that change occur under? Accepting that's a change. It was made in the context of a notice, an informal notice, to Operator Celesi. To an email. To an email. Very informal. Saying, for your revised exploration plan, here's what we want to see now. Why? We were right on the heels of the Deepwater Horizon for 89... Okay, so there's a change from 30 to 120 days. What's the authority for making that change? The authority is regulation that allows the Secretary... Just one minute. 250.30 CFR 250-201. MMS has the authority, now BOEM, has the authority to require additional information as part of an exploration plan or development plan. 250-284 gives MMS, now BOEM, authority to require an operator to submit a revised exploration plan based on a change in circumstances. This authority, again, these are in existing regulations, in existence at the time this lease was issued. And, again, none of these regulations changed. They were renumbered because MMS was parsed up into a number of different agencies now. But the substance of the regulation is not what were changed. The regulations that are new in this case really aren't challenged, and that has to do with the workplace safety rules. What happened? I mean, you figured... Are you saying that under OAKS law, the Secretary determined that 30 days wasn't adequate, which was what the OPA regulation said, so I'm going to change it to 120 days exercising my OAKS law authority? Yes, I'm looking at a... Yes? Yes, I'm looking at a well, the Secretary says, the Macondo well, the blowout is going on for 87 days. And so the Secretary reasonably said 30 days is insufficient. And within my authority that I have from Congress in OAKS law to protect the environment and balance that against the need to develop the resources, I'm going to ask to see and I'm going to ask to make sure that everybody who's out there drilling can respond to this kind of a blowout. And if they can't, then you're not going to be able to drill. And that is within the Secretary's authority. And that change, again, it's within OAKS law, within his authority, it's within existing regulations, and it was a reasonable request to be made to the lessees. And again, none of this changed OPA, what those requirements may be. These are all in the context of approving an exploration plan. Before we approve a plan or development plan, before we approve a plan, like BP had an approved plan to go out and drill that Macondo well, now BP and other lessees, before you do that again, we want to see that you have the financial wherewithal to stop that blowout, number one, and number two, clean up an oil spill that results from it. That's what the Secretary was doing in this case. One of the things that struck me in the Blue Group was the statement that this was a mutually unexpected effort to revise regulations and so on. And it seems to me that any time, if you're in the mining business of any sort, any time there's a disaster, a mine disaster, whether it's a coal mine fire where people are trapped or a collapse in a copper mine or underwaters, that it's not unexpected that the relevant regulatory agency will then make changes based on that disaster. Generally correct, Your Honor. There have been regulatory changes over the years in response to a number of events. Mine safety or whomever. Yeah, so this reminds me, for example, of the Conner Brothers case. We haven't talked about sovereign acts, but the colonel, the base commander, in response to 9-11, no one expected that, but in response to 9-11, he reaches out and says, contractor, you can no longer enter the installation. Nobody's arguing that they couldn't change the regulatory structure based on the Deepwater Horizon disaster. The question is, was that change one that created liability under the contract or not? And if it was a change that was done under OPA, it creates liability under the contract. If it's an OCSLA change, it doesn't. Generally, yes, Your Honor. Again, I've explained why these changes were OCSLA changes, either under the statute or under the existing regulations. And in this case, the trial court correctly agreed with our position and linked each of these actions, and it wasn't difficult, linked each of these actions to OCSLA statute or regulations. And as opposed to what... One other thing with regard to the FAQ document, and I'm looking at the beginning of the first page of it, at Joint Appendix 661, talks about what plans are subject to these information requirements. Again, identifies exploration plans, development plans, and talks about the regulatory authority. Again, the 250 series, the 250 series, now the 550 series, those are OCSLA regulations. Talks about the authority to do that. Now, one other thing, counsel talked at length about a 2012 NTL that started at JA 1371. That's a 2012 NTL. It's not in the complaint, number one. Number two, it has nothing to do with exploration plans or development and production plans at all. Again, I'm looking at page 1371. That NTL is not some reincarnation, I think counsel said, of NTL 06 that's challenged. It's not. What that relates to is something completely separate. NTL 06 is still good law. Well, it should be good law. It's still what operators and lessees are required to comply with, again, under OCSLA, as part of these exploration plans. Mr. Schwinn, getting off the substance of your argument on the procedure, your brief is printed on both pages. I've seen this in other DOJ briefs. That, unless I'm mistaken, is a violation of FRAP. Is the department intending to continue to do that or is this an inadvertence? I believe we're going to continue to do that, Your Honor. And how can that be in violation of FRAP? This should have been sent back by the clerk's office. If that's true, Your Honor, it should have been. And the Justice Department ought to know the rules. We should, Your Honor. I will take that up with the proper people to make sure we're complying with FRAP. Obviously, it's not our intent. We now do almost everything we do double-sided. Well, you can do whatever you want as long as it's not a violation of the rules. This is about the fourth or fifth time this has happened. It looks like a deliberate violation of the rules, and I do think you ought to reconsider that. I will, Your Honor. There are ways to change the rules, as the department knows. Whether it's a good thing or not a good thing, we do have the rules. Yes, Your Honor. Obviously, I take full responsibility for that brief. Do you have a final thought on the merits? Well, Your Honor, we do also ask that the court affirm on the basis of the trial court's holding with respect to breach that none of the actions in this case breached the contract, but also on the basis of the trial court's holding with respect to sovereign acts that given this court's long existing precedent on sovereign acts doctrine that each of the actions taken in this case were, in fact, public in general. We don't have a problem with that with the contract, which specifically allocates the risk of future regulations other than OCSLA to the government. If, Your Honor, this worry changed to a non-OCSLA regulation, it would be a different analysis. But again, the sovereign acts argument becomes the same as the contract language argument. Well, Your Honor, the question still is, the first question is, is a particular action public in general? I think that question would still be answered yes, regardless of what regulation it's under, it's public in general. Everybody has to do it. Yeah, but the contract allocates the risk to you of regulatory changes that are not under OCSLA. I don't understand what the sovereign acts doctrine gets you under those circumstances that you don't already have based on the contract language. Well, in this case, Your Honor, that could be true if the court were to find that Interior had changed regulations outside of OCSLA. But again, that's not the case here. Thank you, Mr. Schwinn. Thank you, Your Honor. We said we'll give Mr. Lee four minutes in rebuttal. Let me see if I can go back and make this clearer. The oil field response plan is something created by the Oil Pollution Act. The whole idea of creating oil field response plans falls under open. Now, what is under OCSLA is that OCSLA gives the Secretary of Interior the right to ask for this information. If you look at the OCSLA rules, it says, yes, for an exploration plan, you can ask for that information. How you calculate that is open. That is clearly under OPA, and you can see it clearly by looking at 254.47 and 254.26. Those are OPA regulations. They both say 30 days. They both said 30 days. Now, they are telling us do 120 days. They tell us do the open hold. In reality, in fact, as even the lower court recognized, just look at what happened. It went from 1,500 barrels a day. They changed the rule, and it went to 218,000 barrels a day. And they're saying that's not a substantive change. OPA, that calculation, worst-case discharge, is created by the Oil Pollution Act. The regulations relating to the calculation, the worst-case discharge, are OPA regulations. They changed that. They changed the rules. They changed the 30 days. They changed how you calculate it. In such a monumental way that it went from 1,500 barrels to 218,000 barrels a day. Now, what happens, the reason it affects the exploration plan is they say now when you apply for the exploration plan, you have to certify that you can clean up something four times bigger than BP. Remember, BP is 50,000. They're telling us now 218,000 on your new calculation and certify to us that you can clean that up. Well, we couldn't do that. Now, they contracted with us to go do that under these OPA rules. When we entered this contract, the OPA rules said, you do it this way, and you come out with 1,500 barrels, and they approved it. We submitted a plan. They approved it. They came back and said, OK, BP. And as WinStar tells us, I mean, Mobile, we're not asking whether it's justifiable, whether this is something foreseeable, is it something that's changing the OPA rules, changing non-OXDA rules. Yes, clearly, worst case discharge is OPA. There's no doubt about it. The words appear over here because they say, you can ask about it. You can ask what that information is. When you get to changing the methods you calculate, that's a whole different ballgame. Now, that changed all kinds of things. It changed the bond we had to put up. It went from 35 now to 150 million. That's a major change. That's material to us. Our OFA response plan, then when you file for the expiration plan, you have to say, this is our OFA response plan, and we can do it. We can certify that financially we can do it. We did that with the 1,500 under the original OPA rules. We did certify. Since we did certify they could do that, they came back and said, we're changing the OPA rules. We're changing the calculation. Now certify to us. Can't do that. We can't do it in the multiple billions. It went from 4 million to over, the 2 million was actually for 50,000. They didn't say we're changing the OPA rules. Well, of course not. They couldn't say that, but that's effectively what they did. That's why I point to what they finally enacted, or finally did by NTL. Obviously very substantive. It should have been a regulation change, but they did it in NTL. That's why I point you to NTL 1206. It is entirely OPA. It says it's OPA. I ask you to read it. It's, if you go to page 29, the basis of the rules that you see in the frequently asked questions. What page is this? 29 of what? That's 29 of the, it's 1406. That's why I go back to the very words that appear in little double I at the top of the page. Joint appendix 1406. That's where they say the basis for this. And in accordance with the requirements of the OPA regulations. Thank you, Mr. Leaf. We'll take the case on revising.